RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0208p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SOCORRO PEREZ-HERNANDEZ,

*Petitioner*,

*v.*

TODD W. BLANCHE, Acting U.S. Attorney General,

*Respondent*.

No. 25-3592

---

On Petition for Review from the Board of Immigration Appeals.
No. A 201 100 613.

Decided and Filed: July 28, 2026

Before: DAVIS, MATHIS, and RITZ, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:** Kevin Gardner, KBG IMMIGRATION LLC, Independence, Ohio, for Petitioner. Jennifer A. Singer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

**OPINION**

---

MATHIS, Circuit Judge. Socorro Perez-Hernandez seeks review of the Board of Immigration Appeals's (BIA) order upholding the immigration judge's (IJ) decision denying his motion to suppress and his applications for withholding of removal and protection under the Convention Against Torture (CAT). He also seeks review of the BIA's order denying his motion to terminate or remand proceedings. For the reasons below, we deny his petition.

**I.**

Perez-Hernandez is a native and citizen of Guatemala.  He describes himself as Maya Quiché, which is an indigenous group in Central America.  Perez-Hernandez lived in Guatemala with his family until 2007, when he fled to the United States because of an intrafamilial land dispute.  After Perez-Hernandez's father inherited the family home, a great uncle threatened to kill Perez-Hernandez and his family.  According to Perez-Hernandez, his great uncle hired hitmen to intimidate his father with machetes.  Fearing for their lives, Perez-Hernandez, along with his father, mother, and five siblings, relocated to another area in Guatemala.

Perez-Hernandez believes there was also a political dimension to the land dispute.  He testified that his father and great uncle disagreed over who should be elected mayor of the town where the disputed land is located.  But he offers little detail connecting the political disagreement to the intrafamilial land dispute.  And Perez-Hernandez did not vote in the mayoral election, as he was too young at the time.

In 2007, Perez-Hernandez entered the United States without being admitted or paroled.  By 2011, Perez-Hernandez lived and worked in northeast Ohio.  On June 6, 2011, a Perry Township police officer saw Perez-Hernandez discard a cigarette butt on the street.  Under Ohio law, littering is a third-degree misdemeanor punishable by up to 60 days in jail.  Ohio Rev. Code Ann. §§ 3767.32(A), 3767.99(C), 2929.24(A)(3).  The officer confronted Perez-Hernandez and asked him for identification.  At first, Perez-Hernandez claimed he did not have identification on him.  But eventually he produced an Alabama identification card, which the officer believed was fake.  So the officer asked Perez-Hernandez for his social security number, but the number Perez-Hernandez provided did not match any individual.  The officer then filed a criminal complaint charging Perez-Hernandez with: (1) possessing false identification, in violation of Ohio Revised Code § 4507.30(C); and (2) obstructing official business, in violation of Ohio Revised Code § 2921.31.

On June 10, 2011, the Department of Homeland Security (DHS) initiated removal proceedings against Perez-Hernandez.  Perez-Hernandez moved to suppress evidence of his alienage and identity, alleging that the police and DHS agents violated the Fourth Amendment,

the Fifth Amendment, and federal regulations prohibiting coercion.  Specifically, he claimed that the Perry Township police officer racially profiled him based on his "Hispanic appearance." A.R. 431.  He also claimed that the police never read him his *Miranda* rights, which he calls "inherently coercive."  D. 14 at p.29.  The IJ denied the motion to suppress, finding that Perez-Hernandez failed to establish a prima facie case of any constitutional or regulatory violation.

Perez-Hernandez conceded removability and applied for asylum, withholding of removal, and CAT protection.  He argued that he was persecuted in Guatemala on account of his membership in two protected social groups—"[m]ale Maya Quiche landowners in Guatemala who are perceived as supporting [mayoral candidate] Simon Gaspar Garcia" and "immediate members of the Perez-Hernandez family"—and would face future persecution and torture if he returned to Guatemala.  A.R. 46.

The IJ denied Perez-Hernandez's applications for relief.  To start, the IJ determined that Perez-Hernandez's asylum application was time-barred because he did not file it within one year of his arrival in the United States, and no extraordinary circumstances justified the delay.  But even if Perez-Hernandez's asylum application had been timely, the IJ concluded that he would deny asylum, as well as withholding of removal, on the merits.  Relevant here, the IJ found that the great uncle threatened Perez-Hernandez's family for personal reasons, not political reasons, and so there was no nexus between the alleged harm and any protected ground.  Finally, the IJ concluded that Perez-Hernandez was not entitled to CAT protection because he had not shown a likelihood of torture if removed to Guatemala.

Perez-Hernandez appealed the IJ's denial of his motion to suppress and his applications for withholding of removal and CAT protection to the BIA.  On June 9, 2021, two months after filing his appeal, Perez-Hernandez moved to terminate or remand his proceedings based on *Niz-Chavez v. Garland*, 593 U.S. 155 (2021), which held that a notice to appear must include all information about a noncitizen's removal hearing in a single document.  Perez-Hernandez asserted that his notice to appear did not include the date and time for his initial hearing, and therefore the immigration court never had jurisdiction.  But subsequent BIA precedent interpreted *Niz-Chavez* as not affecting the IJ's jurisdiction.  *See Arambula-Bravo*, 28 I. & N. Dec. 388, 392 (BIA 2021).  So on August 31, 2022, Perez-Hernandez filed a renewed motion to

terminate or remand, arguing for the first time that his noncompliant notice to appear violated a claims-processing rule.**[1]**

The BIA affirmed the IJ's denial of Perez-Hernandez's motion to suppress and his applications for withholding of removal and CAT protection.  It also denied as untimely Perez-Hernandez's motion to terminate or remand proceedings.

Perez-Hernandez now petitions this court for review.

**II.**

We have jurisdiction to review the BIA's final orders of removal.  8 U.S.C. § 1252(a)(1); *Mohammed v. Bondi*, 129 F.4th 988, 989–90 (6th Cir. 2025).  We consider the BIA's decision "the final agency determination" when it issues a "separate opinion." *Zaldana Menijar v. Lynch*, 812 F.3d 491, 497 (6th Cir. 2015) (quotation omitted).  We "also review the [IJ]'s decision to the extent that the [BIA] adopted it." *Juan Antonio v. Barr*, 959 F.3d 778, 788 (6th Cir. 2020).

We review the BIA's legal determinations de novo and its factual findings for substantial evidence.  *Tista-Ruiz de Ajualip v. Garland*, 114 F.4th 487, 495 (6th Cir. 2024).  Substantial evidence "is more than a mere scintilla, but means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Urias-Orellana v. Bondi*, 607 U.S. 537, 544 (2026) (citation modified).  Under the substantial-evidence standard, we "will uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Mazariegos-Rodas v. Garland*, 122 F.4th 655, 664 (6th Cir. 2024) (citation modified).  We will not reverse the BIA's factual findings "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Urias-Orellana*, 607 U.S. at 544 (quoting 8 U.S.C. § 1252(b)(4)(B)).

We review the BIA's denials of motions to terminate proceedings and motions to remand under the abuse-of-discretion standard.  *Ahmed v. Mukasey*, 519 F.3d 579, 585 (6th Cir. 2008);

---

**[1]**Perez-Hernandez also argued that remand was warranted because the IJ "relied on . . . [a now-vacated decision] for the proposition that private acts of violence do not constitute persecution."  A.R. 52.  We need not address this argument because the BIA affirmed the IJ's withholding-of-removal decision based only on the dispositive finding that no nexus exists between the alleged harm and a protected ground.

*Vang v. Gonzales*, 237 F. App'x 24, 29 (6th Cir. 2007). "The BIA abuses its discretion if its decision was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination." *Marqus v. Barr*, 968 F.3d 583, 592 (6th Cir. 2020) (citation modified).

## III.

Perez-Hernandez challenges the BIA's order: (1) affirming the IJ's denial of his motion to suppress evidence; (2) denying his motion to terminate or remand proceedings; (3) affirming the IJ's denial of his claim for withholding of removal; and (4) affirming the IJ's denial of his claim for CAT relief. We address each argument in turn.

## A.

We start with the denial of Perez-Hernandez's motion to suppress evidence. "One who raises the claim questioning the legality of the evidence must come forward with proof establishing a prima facie case before the [DHS] will be called on to assume the burden of justifying the manner in which it obtained the evidence." *Luevano v. Holder*, 660 F.3d 1207, 1212 (10th Cir. 2011) (quoting *Burgos*, 15 I. & N. Dec. 278, 279 (BIA 1975)). Perez-Hernandez argues that his stop by Perry Township police was pretextual and racially motivated, in violation of the Fourth Amendment. He also argues that the evidence and statements law enforcement obtained from him while he was in custody were coerced and therefore violated his rights under the Fifth Amendment and federal regulations.

## 1.

*Fourth Amendment claim.* The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Relevant here, an investigatory stop is a seizure. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Thus, law enforcement may normally conduct warrantless investigatory stops only if they have "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation modified). To deter unlawful

searches, courts have established "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009).

The exclusionary rule generally applies in criminal, not civil, proceedings. *See United States v. Janis*, 428 U.S. 433, 454 (1976). And the Supreme Court has "come[] out against applying the exclusionary rule in civil deportation hearings." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050 (1984). That said, the Court left open the possibility that the exclusionary rule could apply to "egregious" or "widespread" Fourth Amendment violations. *Id.* (plurality opinion); *see Nolasco-Gaspar v. Holder*, 581 F. App'x 546, 546 (6th Cir. 2014) (per curiam). An "egregious violation[]" is one "that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Lopez-Mendoza*, 468 U.S. at 1050–51 (plurality opinion).

Perez-Hernandez claims that police committed an egregious violation by stopping him because of his race. We have hinted that a strictly race-based stop could constitute an egregious violation. *See Nolasco-Gaspar*, 581 F. App'x at 547 (rejecting an egregious-violation claim after concluding that there was "no evidence that [petitioner] was questioned solely because he is Hispanic"); *United States v. Navarro-Diaz*, 420 F.3d 581, 587 (6th Cir. 2005) (no egregious violation where the defendant "was not accosted by the police in a random attempt to determine whether he was" in the country without authorization). Some of our sister circuits have been more explicit that a stop based on race alone is an egregious violation of the Fourth Amendment. *See Almeida-Amaral v. Gonzales*, 461 F.3d 231, 235–37 (2d Cir. 2006) ("[W]ere there evidence that the stop was based on race, the violation would be egregious, and the exclusionary rule would apply."); *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1452 (9th Cir. 1994) (concluding that a solely "race-based stop was an egregious constitutional violation," requiring suppression of the evidence obtained). We assume without deciding that a stop based solely on race is an egregious violation of the Fourth Amendment, which would permit the use of the exclusionary rule.

But Perez-Hernandez's Fourth Amendment claim still fails because he did not establish a prima facie case of an illegal stop. Before approaching Perez-Hernandez, the Perry Township police officer witnessed him throw a cigarette butt in the street. Littering is a misdemeanor in Ohio. Ohio Rev. Code Ann. § 3767.32(A), (D)(1). So the officer had reasonable suspicion

(if not probable cause) that Perez-Hernandez had engaged in criminal activity in his presence. This reasonable suspicion allowed the officer to lawfully stop Perez-Hernandez to investigate. Perez-Hernandez does not show that the officer questioned him "solely because he [looked] Hispanic," *Nolasco-Gaspar*, 581 F. App'x at 547, nor that the officer did so "in a random attempt to determine whether [Perez-Hernandez] was" in the country without authorization, *Navarro-Diaz*, 420 F.3d at 587.

Perez-Hernandez does not dispute that he discarded the cigarette butt on the street in the officer's view. Instead, he concludes that the officer had an impermissible racial motive because "the authorities failed to charge [him] with the initial crime that supposedly led to the initial stop." D. 14 at p.24. But "the fact that [a defendant] ultimately [i]s not charged for the offense by itself does not negate the existence of probable cause for an arrest." *Courtright v. City of Battle Creek*, 839 F.3d 513, 521 n.2 (6th Cir. 2016). And while Perez-Hernandez notes correctly that "unlawful presence in the U.S. is not itself a violation of criminal law," that is not why the police arrested him. D. 14 at p.25. They arrested him on charges of presenting a false document and obstructing official business.

## 2.

*Fifth Amendment claim.* Perez-Hernandez argues that the use, during removal proceedings, of his statements made to law enforcement about his identity violated his Fifth Amendment due-process and self-incrimination rights. We disagree.

The Due Process Clause provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Noncitizens have a right to due-process protections—specifically, procedural due process—in removal proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993). To that end, the government cannot remove a person from the United States without notice and an opportunity to be heard. *See A.A.R.P. v. Trump*, 605 U.S. 91, 94–95 (2025) (per curiam). "The protection afforded by procedural due process includes a fair hearing in accord with fundamental fairness." *Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) (citation modified). In the context of removal proceedings, the government must rely on evidence that is "probative," and the government's use of that evidence must be "fundamentally

fair." *Galvan v. Holder*, 403 F. App'x 35, 41 (6th Cir. 2010) (quoting *Alexandrov v. Gonzales*, 442 F.3d 395, 404–05 (6th Cir. 2006)).

The Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  The Clause "protects the individual against being involuntarily called as a witness against himself in a criminal prosecution [and] also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).  It also prevents a prosecutor or judge in a criminal case from telling the jury that "it may draw an inference of guilt from a defendant's failure to testify about facts relevant to his case." *Baxter v. Palmigiano*, 425 U.S. 308, 317 (1976).

"Recognizing that the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements," *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011) (citation modified), the Supreme Court adopted what we now refer to as *Miranda* warnings.  So before questioning an in-custody suspect, law enforcement must warn that person "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  These "prophylactic measures" are "designed to safeguard the constitutional guarantee against self-incrimination." *J.D.B.*, 564 U.S. at 269.

No due-process violation occurred here.  Perez-Hernandez's statements (or misstatements) to law enforcement about his identity were probative.  And Perez-Hernandez failed to show that there was anything fundamentally unfair about the government relying on those statements.

Nor has Perez-Hernandez shown a self-incrimination violation.  Even if we assume that the Self-Incrimination Clause applies in removal proceedings, Perez-Hernandez has not established a prima facie case that he made involuntary statements to law enforcement.

Perez-Hernandez responds that law enforcement coerced him into making incriminating statements by failing to apprise him of his *Miranda* rights.  But a failure to provide *Miranda*

warnings "does not render [a noncitizen's statements] inadmissible in deportation proceedings." *Zuniga v. Garland*, 86 F.4th 1236, 1241 (9th Cir. 2023) (citation modified); *see also Puc-Ruiz v. Holder*, 629 F.3d 771, 779 (8th Cir. 2010) ("A removal hearing is a civil proceeding, and the fact that a[ noncitizen] has not received *Miranda*-like warnings will not render his statements inadmissible in a deportation hearing.").

**3.**

*Regulatory claim.* We turn next to Perez-Hernandez's contention that immigration officials violated 8 C.F.R. § 287.8. This regulation prohibits, among other things, "[t]he use of threats, coercion, or physical abuse by the designated immigration officer to induce a suspect to waive his or her rights or to make a statement." 8 C.F.R. § 287.8(c)(2)(vii). Perez-Hernandez claims that immigration officials, working with local law enforcement, coerced him into making statements about his identity and alienage by not providing *Miranda* warnings. But, for the reasons above, the immigration officials' failure to provide Perez-Hernandez with *Miranda*'s prophylactic measures does not suffice to show coercion. And because Perez-Hernandez has otherwise failed to show a violation of § 287.8(c)(2)(vii), his regulatory claim fails. *See Nolasco-Gaspar*, 581 F. App'x at 547.

**B.**

We now turn to the BIA's denials of Perez-Hernandez's motion to terminate or remand proceedings. Perez-Hernandez argues that his notice to appear lacked a date and time, which he claims violates a claims-processing rule and therefore merits termination or remand of his removal proceedings.

When initiating removal proceedings against an individual, the government must provide that individual with a written notice to appear. 8 U.S.C. § 1229(a)(1). Once the government properly serves a notice to appear, the clock stops on a noncitizen's period of continuous presence in the United States. *Id.* § 1229b(d)(1). To trigger the stop-time rule, the notice to appear must include the specific time and place of the removal proceeding. *Pereira v. Sessions*, 585 U.S. 198, 218 (2018). The notice to appear also must be "a single document containing all

the information an individual needs to know about his removal hearing." *Niz-Chavez*, 593 U.S. at 158.

Recall that Perez-Hernandez, in his initial motion to terminate his removal proceedings, argued that, under *Niz-Chavez*, a noncompliant notice to appear deprives the IJ of jurisdiction over a noncitizen's removal. But shortly after the release of the *Niz-Chavez* decision, the BIA disagreed with this position, holding that *Pereira* and *Niz-Chavez* spoke only to whether a noncompliant NTA triggers the stop-time rule. *Arambula-Bravo*, 28 I. & N. Dec. at 392. The BIA found that neither decision affected the IJ's jurisdiction. *Id.*

Subsequently, Perez-Hernandez abandoned his jurisdictional argument, asserting instead in a renewed motion that § 1229's time-and-place requirement is a mandatory claims-processing rule. *See generally Fernandes*, 28 I. & N. Dec. 605 (BIA 2022). But unlike jurisdictional rules, a party can waive or forfeit the ability to invoke mandatory claims-processing rules. *McIntosh v. United States*, 601 U.S. 330, 337 (2024). The BIA "will generally consider an objection to a noncompliant notice to appear to be timely if it is raised prior to the closing of pleadings before the [IJ]." *Fernandes*, 28 I. & N. Dec. at 610–11.

Perez-Hernandez did not object to his notice to appear until after the issuance of the IJ's decision. So he forfeited that objection. The BIA, having concluded that Perez-Hernandez's claims-processing argument was untimely, did not abuse its discretion when it denied his motion to terminate or remand. At no point during removal proceedings before the IJ did Perez-Hernandez object to any purported defect in his notice to appear. He first challenged the notice to appear on June 9, 2021, two months after he appealed the IJ's removal decision. And that was an attack on jurisdiction; he did not make the claims-processing argument until August 31, 2022. So the BIA did not err in denying Perez-Hernandez's motion to terminate or remand as untimely.

Perez-Hernandez presses a couple of counterarguments. But they are unavailing.

First, Perez-Hernandez claims that the BIA "left open the question of whether an objection [to a claims-processing rule] after the close of proceedings is timely." D. 14 at p.17. For support, he relies on *Matter of Vargas*, 27 I. & N. Dec. 745 (BIA 2020). There, the BIA concluded that two noncitizens, a mother and son, had raised timely challenges to their

noncompliant notices to appear four years after the government served them with the notices. *Id.* at 746. But *Vargas* does not help Perez-Hernandez. Although four years had passed, the IJ proceedings were still open when the noncitizens objected to the notices to appear. *See id.*

Second, Perez-Hernandez argues that he could not have raised his claims-processing objection earlier because the Supreme Court decided *Niz-Chavez* after the close of his proceedings before the IJ. Yet Perez-Hernandez waited over a year after *Niz-Chavez*'s issuance to raise his claims-processing argument. Not only that, but *Niz-Chavez* did not overturn established precedent; instead, it "interpreted a statute that had been in effect since 1997" and "simply explained what [the statute] had meant all along." *Santizo-Soto v. Garland*, No. 23-3468, 2024 WL 4512534, at *2 (6th Cir. Oct. 17, 2024). Indeed, "[n]othing prevented [Perez-Hernandez] from making to the IJ the same statutory argument that Niz-Chavez made in his immigration proceedings." *Id.*

**C.**

We consider next Perez-Hernandez's withholding-of-removal claim. Withholding-of-removal claims protect a noncitizen from removal based on the noncitizen's membership in a protected group. The Attorney General may not remove a noncitizen to a country if that person's "life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). In other words, withholding-of-removal claims require an applicant to show a "nexus" between his "risk of persecution in the country of removal" and his "membership in a protected group." *Patel v. Bondi*, 131 F.4th 377, 381 (6th Cir. 2025). To show a nexus, a withholding-of-removal claim requires "that a statutorily protected ground be 'a reason' for alleged persecution." *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 851 (6th Cir. 2023) (quoting *Guzman-Vazquez v. Barr*, 959 F.3d 253, 271 (6th Cir. 2020)). We review a nexus determination, which is a finding of fact, for substantial evidence. *Id.* at 847.

Perez-Hernandez argues that he was persecuted because of his membership in particular social groups. He identifies those particular social groups as "[m]ale Maya Quiche landowners in Guatemala who are perceived as supporting Simon Gaspar Garcia" and "immediate members of the Perez-Hernandez family." A.R. 46. We need not decide whether either qualifies as a

particular social group because Perez-Hernandez fails to show a nexus between his alleged persecution and his proposed social groups.

To obtain relief, Perez-Hernandez needed to show that his membership in one of these social groups was a reason for his persecution. *Sebastian-Sebastian*, 87 F.4th at 851. But, as the BIA found, Perez-Hernandez's great uncle did not target him or his family because of their social status; he targeted them for personal reasons through "acts motivated solely by criminal intent, a personal vendetta, or a desire for revenge." A.R. 26. Fear of "retribution solely over personal matters" does not qualify Perez-Hernandez for withholding-of-removal relief. *Sebastian-Sebastian*, 87 F.4th at 847 (quotation omitted); *Kamar v. Sessions*, 875 F.3d 811, 818 (6th Cir. 2017). Perez-Hernandez's conflict with his great uncle was a personal, intrafamilial dispute over the disposition of property. Perez-Hernandez does not direct us to any evidence that his great uncle targeted other Maya Quiché landowners, or that his great uncle held animus against Perez-Hernandez's family apart from his desire to eject the family from their land. *See Cruz-Guzman v. Barr*, 920 F.3d 1033, 1038 (6th Cir. 2019) ("The fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground." (citation modified)); *Solis-Nolasco v. Holder*, 533 F. App'x 601, 605 (6th Cir. 2013) (per curiam) ("Mistreatment based on a land dispute does not fall under a protected ground of [§ 1231(b)(3)(A)].").

Perez-Hernandez pushes back. He believes that the dispute was not solely personal, claiming that "there was a connection between the dispute and his father's political views." D. 14 at p.35. But Perez-Hernandez's testimony on this point does not suffice to show a nexus. Perez-Hernandez recalls a political disagreement between his father and great uncle over mayoral candidates, but he does not say when the disagreement occurred. Nor does he provide any evidence of a connection between politics and the great uncle's criminal efforts to seize his father's land. If anything, Perez-Hernandez's testimony implies that the land dispute caused the political disagreement, not the other way around. When asked why his father and great uncle came to disagree on politics, Perez-Hernandez replied, "Well, because [my father and great uncle] fought over the land." A.R. 213. Thus, substantial evidence supports the IJ's finding—

which the BIA affirmed—that this purported political disagreement had no "impact or influence over the great uncle wanting to remove the father from the disputed lands." *Id.* at 246.

**D.**

Finally, we turn to Perez-Hernandez's CAT claim.  To obtain CAT relief, an applicant "must establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Sebastian-Sebastian*, 87 F.4th at 851 (citation modified).  Torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Zaldana Menijar*, 812 F.3d at 501 (quotation omitted); *see also* 8 C.F.R. § 1208.18(a)(1).  The BIA considers: (1) "[e]vidence of past torture inflicted upon the applicant"; (2) "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured"; (3) "[e]vidence of gross, flagrant[,] or mass violations of human rights within the country of removal"; and (4) "[o]ther relevant information regarding conditions in the country of removal."  8 C.F.R. § 1208.16(c)(3); *see also Amir v. Gonzales*, 467 F.3d 921, 926–27 (6th Cir. 2006).

Substantial evidence supports the BIA's finding that Perez-Hernandez "did not demonstrate that it is more likely than not that he would be tortured upon return to Guatemala." A.R. 26.  Perez-Hernandez concedes that he did not suffer torture in the past.  He also testified that his immediate family relocated to another part of Guatemala ten hours away to avoid torture. *See Cristobal-Leon v. Holder*, 510 F. App'x 397, 400 (6th Cir. 2013) (upholding a denial of CAT protection where applicant's "entire family has continued to live in Guatemala without any apparent harm").

In response, Perez-Hernandez points to a 2019 Human Rights Report as proof that "[t]he Guatemalan government will acquiesce [in] the torture because of [his] race." D. 14 at p.45.  But the BIA's conclusion that Perez-Hernandez did not demonstrate a likelihood of torture is dispositive on the issue of CAT protection.  Arguments about government acquiescence in torture are relevant only if the noncitizen can show a likelihood of torture in the first place.

*See Garcia-Aranda v. Garland*, 53 F.4th 752, 758–59 (2d Cir. 2022) (describing the CAT analysis as a two-step inquiry, which ends if the applicant cannot show "it is more likely than not that he or she will be harmed upon removal in a way recognized by section 1208.18(a)").

**IV.**

For these reasons, we **DENY** Perez-Hernandez's petition for review.